

# COURT OF APPEALS

## SECOND DISTRICT OF TEXAS
### FORT WORTH

### NO. 02-11-00480-CV

| | | |
|---|---|---|
| In the Interest of A.L.W. and M.M.P., the Children | § | From the 393rd District Court |
| | § | of Denton County (2010-61410-393) |
| | § | November 8, 2012 |
| | § | Opinion by Justice Gabriel |

## JUDGMENT

This court has considered the record on appeal in this case and holds that there was no error in the trial court's judgment. It is ordered that the judgment of the trial court is affirmed.

SECOND DISTRICT COURT OF APPEALS

By_____
Justice Lee Gabriel



# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

### NO. 02-11-00480-CV

IN THE INTEREST OF A.L.W. AND
M.M.P., THE CHILDREN

----------

FROM THE 393RD DISTRICT COURT OF DENTON COUNTY

----------

## MEMORANDUM OPINION[1]

----------

Appellants D.W.P. (Father) and E.W. (Mother) appeal the trial court's judgment terminating their parental rights to their child, M.M.P. (Maria).[2] Mother also appeals the termination of her parental rights to her child A.L.W. (Abigail). Appellant D.P. (Grandmother) appeals the trial court's judgment granting

---

[1]*See* Tex. R. App. P. 47.4.

[2]We use aliases for the children and their relatives throughout this opinion. *See* Tex. R. App. P. 9.8(b)(2).

managing conservatorship of Maria to A.M. (Ann Maroney) and B.M. (Bob Maroney).  We affirm.

## Background Facts

Mother gave birth to Abigail in October 2006, during her marriage to Z.W. (Ex-Husband).  They later divorced, and Mother began dating Father.  The Department of Family and Protective Services (DFPS or the Department) was first called to Mother and Father's apartment in February 2009 for concerns over a domestic dispute.  Police found marijuana in the parents' bathroom, which Mother said was hers.  Mother was arrested for possession of the marijuana.  DFPS closed its case because Mother sought treatment for anxiety and bipolar disorder from Denton County Mental Health and Mental Retardation (MHMR).

Mother eventually became pregnant with Maria.  During her pregnancy with Maria, Mother's parents divorced, and Mother moved in with her aunt and uncle, the Maroneys.  After a few weeks, Mother left the Maroneys and moved in with Father and his parents.  Mother gave birth to Maria in December 2009.

In July 2010, DFPS was notified over concerns of drug use by both parents.[3]  Mother and Father were asked to take drug tests, which they refused.  Mother then moved to Nacogdoches, and Father followed shortly thereafter.  In October 2010, after Mother tested positive for ecstasy, DFPS took custody of the

---

[3]It is unclear from the record how many cases DFPS has opened on the parents.  Father told First Steps in his chemical dependency evaluation that this was his fourth case with DFPS.

3

children and placed Abigail with her father, Ex-Husband, and Maria with Father's parents, Grandmother and Grandfather. The day after removal, Father tested positive for cocaine, marijuana, and methamphetamine.

The parents then moved to Austin, where Father had found work. While living in Austin, the parents were arrested for public intoxication and possession of drug paraphernalia. In March 2011, Mother and Father moved into an RV rented from Father's parents in Denton. After a few weeks, they moved into a house in Denton also rented from Father's parents.

Sometime around April 2011, Grandmother and Grandfather took Maria to Nacogdoches to see Mother's grandmother. Mother and Father followed in their own car to empty a storage unit. The parents met up with Grandmother and Grandfather at Mother's grandmother's apartment. This visit had been specifically denied by DFPS. When the Department found out about the Nacogdoches trip, they moved Maria to the Maroneys.

In March 2011, a man matching Father's description stole clothes from a Buckle store in Vista Ridge Mall. A witness got the license plate of the car the man left in, which matched Grandmother's car. In June 2011, Mother and Father were detained at a Wal-Mart because they switched tags on some bicycles. They were cited for trespass, but the police officers arrested Father for the Buckle theft.

DFPS moved for termination because the parents had not made sufficient progress on their service plan. Both Grandmother and the Maroneys intervened,

4

requesting managing conservatorship. A jury found by clear and convincing evidence that Mother and Father had engaged in conduct or had knowingly placed Maria with persons who engaged in conduct that endangered her physical or emotional well-being; that Mother and Father had knowingly placed or knowingly allowed Maria to remain in conditions or surroundings that endangered her physical or emotional well-being; that Mother and Father had failed to comply with the provisions of a court order that specifically established the actions necessary for them to obtain Maria's return; that Mother and Father had used a controlled substance in a manner that endangered Maria's health or safety and had failed to complete a court-ordered substance abuse treatment program, or after completion of such a program, had continued to abuse a controlled substance; and that termination of Mother and Father's parental rights to Maria was in her best interest. The jury also found that Mother had engaged in conduct or had knowingly placed Abigail with persons who engaged in conduct that endangered Abigail's physical or emotional well-being; that Mother had knowingly placed or had knowingly allowed Abigail to remain in conditions or surroundings that endangered her physical or emotional well-being; that Mother had failed to comply with the provisions of a court order that specifically established the actions necessary for her to obtain Abigail's return; that Mother had used a controlled substance in a manner that endangered Abigail's health or safety and had failed to complete a court-ordered substance abuse treatment program, or after completion of such a program, had continued to abuse a

5

controlled substance; and that termination of Mother's parental rights to Abigail was in her best interest. The jury found that the Maroneys should be awarded managing conservatorship of Maria.[4] Mother, Father, and Grandmother filed this appeal.

## Standard of Review

A parent's rights to "the companionship, care, custody, and management" of his or her children are constitutional interests "far more precious than any property right." *Santosky v. Kramer*, 455 U.S. 745, 758–59, 102 S. Ct. 1388, 1397 (1982); *In re M.S.*, 115 S.W.3d 534, 547 (Tex. 2003). "While parental rights are of constitutional magnitude, they are not absolute. Just as it is imperative for courts to recognize the constitutional underpinnings of the parent-child relationship, it is also essential that emotional and physical interests of the child not be sacrificed merely to preserve that right." *In re C.H.*, 89 S.W.3d 17, 26 (Tex. 2002). In a termination case, the State seeks not just to limit parental rights but to erase them permanently—to divest the parent and child of all legal rights, privileges, duties, and powers normally existing between them, except for the child's right to inherit. Tex. Fam. Code Ann. § 161.206(b) (West 2008); *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985). We strictly scrutinize termination proceedings and strictly construe involuntary termination statutes in favor of the

---

[4]The jury was not asked who should be granted managing conservatorship of Abigail. In the final order of termination, the trial court granted Ex-Husband managing conservatorship of Abigail.

parent. *Holick*, 685 S.W.2d at 20–21; *In re R.R.*, 294 S.W.3d 213, 233 (Tex. App.—Fort Worth 2009, no pet.).

In proceedings to terminate the parent-child relationship brought under section 161.001 of the family code, the petitioner must establish one ground listed under subsection (1) of the statute and must also prove that termination is in the best interest of the child. Tex. Fam. Code Ann. § 161.001 (West Supp. 2012); *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005). Both elements must be established; termination may not be based solely on the best interest of the child as determined by the trier of fact. *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987); *In re D.T.*, 34 S.W.3d 625, 629 (Tex. App.—Fort Worth 2000, pet. denied).

Termination decisions must be supported by clear and convincing evidence. Tex. Fam. Code Ann. § 161.001; *see also* § 161.206(a). Evidence is clear and convincing if it "will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *Id.* § 101.007 (West 2008). Due process demands this heightened standard because termination results in permanent, irrevocable changes for the parent and child. *In re J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002); *see In re J.A.J.*, 243 S.W.3d 611, 616 (Tex. 2007) (contrasting standards for termination and modification).

**Discussion**

**1. Intervention by Grandmother**

In her first issue, Grandmother argues that the trial court erred by failing to rule on her petition to intervene. Grandmother filed a "Petition in Intervention for Conservatorship and Request for Appointment as Temporary Possessory Conservator." DFPS filed a motion to strike the intervention and requested that the trial court dismiss Grandmother as a party to the suit. After a hearing on the motion to strike on June 8, 2011, the trial court signed an order that stated,

> [T]he Court at this time makes no finding regarding the intervention, takes the same under advisement, and reserves the determination of this issue to such time as the court determines a final determination should take place.
>
> . . . [T]he Court grants the party seeking intervention, [Grandmother], the right to appear in the Court through counsel in this cause, the right to receive notice of all proceedings, the right to conduct reasonable discovery, and the obligation to respond to discovery, the same as a party to this action, without specifically finding that [Grandmother] is a party.

Grandmother argues that the trial court erred by failing to find that she had standing to intervene. However, Grandmother actively participated at trial through her counsel, introduced evidence, called witnesses, and had the opportunity to cross-examine all other witnesses. She was listed in the jury charge for the jury to consider her as the possible managing conservator of Maria. Grandmother has thus failed to demonstrate what harm she suffered by the trial court's refusal to make a finding regarding her motion for intervention. *See* Tex. R. App. P. 44.1(a) (stating that no judgment may be reversed on appeal

8

unless the error complained of probably caused the rendition of an improper judgment or probably prevented the appellant from properly presenting her appeal). We therefore overrule Grandmother's first issue.

## 2. Intervention by the Maroneys

In her second issue, Grandmother argues that the trial court erred by granting the Maroneys' petition to intervene. We review a trial court's order granting or denying a motion to strike an intervention under an abuse of discretion standard. *In re A.M.*, 60 S.W.3d 166, 168 (Tex. App.—Houston [1st Dist.] 2001, no pet.) (citing *Mendez v. Brewer*, 626 S.W.2d 498, 499 (Tex. 1982)).

To determine whether a trial court abused its discretion, we must decide whether the trial court acted without reference to any guiding rules or principles; in other words, we must decide whether the act was arbitrary or unreasonable. *Low v. Henry*, 221 S.W.3d 609, 614 (Tex. 2007); *Cire v. Cummings*, 134 S.W.3d 835, 838–39 (Tex. 2004). An appellate court cannot conclude that a trial court abused its discretion merely because the appellate court would have ruled differently in the same circumstances. *E.I. du Pont de Nemours & Co. v. Robinson*, 923 S.W.2d 549, 558 (Tex. 1995); *see also Low*, 221 S.W.3d at 620. An abuse of discretion does not occur when the trial court bases its decision on conflicting evidence and some evidence of substantive and probative character supports its decision. *Unifund CCR Partners v. Villa*, 299 S.W.3d 92, 97 (Tex. 2009); *Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 211 (Tex. 2002).

The Maroneys filed a petition in intervention on June 17, 2011. Father filed a motion to strike the Maroneys' petition. A hearing was held on Father's motion and the trial court denied the motion to strike intervention.

Section 102.004(b) of the family codes states,

> [T]he court may grant a grandparent or other person deemed by the court to have had substantial past contact with the child leave to intervene in a pending suit filed by a person authorized to do so under this subchapter if there is satisfactory proof to the court that appointment of a parent as a sole managing conservator or both parents as joint managing conservators would significantly impair the child's physical health or emotional development.

Tex. Fam. Code Ann. § 102.004(b) (West 2008). Grandmother argues that the Maroneys did not have substantial past contact with Maria.[5] "Substantial past contact" is not statutorily defined, and case law has not delineated any parameters for the amount of contact an intervenor is required to have had with the child. However, courts have considered where the child has resided in their analysis of substantial contact. *See, e.g.*, *In re N.L.G.*, 238 S.W.3d 828, 831 (Tex. App.—Fort Worth 2007, no pet.) (upholding intervention by foster parents when child had lived with them for about fourteen months); *A.M.*, 60 S.W.3d at 169 (upholding trial court's implied finding that intervenors had substantial contact with the child when they had fostered the child for seven months at the

---

[5]Grandmother also argues that the Maroneys are not within three degrees of consanguinity. Consanguinity, however, is relevant only to subsection (a) of the statute. *See* Tex. Fam. Code Ann. § 102.004(a) (allowing a grandparent "or another relative of the child related within the third degree by consanguinity" to file an original suit requesting managing conservatorship). The Maroneys did not file an original suit but intervened in the suit filed by DFPS.

time they filed their plea in intervention and had fostered the child for another seven months by the time their standing to intervene was challenged).

Maria was placed with the Maroneys on May 2, 2011. At the time the Maroneys intervened, Maria had been living in their house fulltime for almost seven weeks. While the length of time is shorter than in many cases, it is not so short that it could not be seen as substantial. *Cf. In re C.M.C.*, 192 S.W.3d 866, 872 (Tex. App.—Texarkana 2006, no pet.) (holding that intervenors did not have substantial past contact with the children when they had only met the older child twice and had never met the younger child).

Since the Texas Legislature passed section 102.004(b) of the family code in 1995, there has been a new, more relaxed standard for determining standing based on substantial past conduct in a termination proceeding such as this. *See* Tex. Fam. Code Ann. § 102.004(b); *In re N.L.G.*, 238 S.W.3d at 831. We believe section 102.004(b) gives the trial judge the discretion to determine whether those who undertake the day-to-day supervision of a child, her activities, and most of the functions ordinarily associated with legal custody have substantial past contact to confer standing to intervene. Sound policy supports this relaxed standard when managing conservatorship is already an issue in the case. *See In re M.T.*, 21 S.W.3d 925, 927 (Tex. App.—Beaumont 2000, no pet.) ("Sound policy underlies the Legislature's creation of a relaxed standing rule subject to court discretion for intervention in an existing suit."). The child's best interest is the predominant issue before the court, and allowing the intervention of parties

who wish to adopt the child may enhance the trial court's ability to adjudicate that issue. *See N.L.G.*, 238 S.W.3d at 830. We therefore cannot say that the trial court's decision was so arbitrary or so unreasonable so as to constitute an abuse of its discretion. *See In re Hidalgo*, 938 S.W.2d 492, 495 (Tex. App.—Texarkana 1996, no writ) (upholding stepgrandmother's intervention when child had lived with stepgrandmother for just over two months and she "had been close, both emotionally and physically, to the child since her birth"). We overrule Grandmother's second issue.

**3. Failure to sever issues**

In her third issue, Grandmother argues that the trial court erred by denying motions to sever issues in this case. Both Mother and Father filed a motion to sever issues. The record contains an order stating that a hearing was held and the trial court denied Father's motion. Grandmother claims that she joined in the motions "on the date of the hearing," but there is no written motion in the record, and we received no reporter's record of the hearing.

The trial court has broad discretion in determining whether to sever a claim. *Guaranty Fed. Sav. Bank v. Horseshoe Operating Co.*, 793 S.W.2d 652, 658 (Tex. 1990). A claim is severable if (1) the controversy involves more than one cause of action, (2) the severed claim is one that would be the proper subject of a lawsuit if independently asserted, and (3) the severed claim is not so interwoven with the remaining action that they involve the same facts and issues. *Id*.

12

Grandmother argues that the parents should have had separate trials so that they would not "be tried on the mistakes or acts of the other parent." Grandmother claims that "there was prejudice because of the very nature of someone who does drugs" and that Father's criminal history "placed him at odds with the other parties." One of DFPS's bases for termination of Mother and Father's parental rights was that they had knowingly placed or knowingly allowed the children to remain in conditions or surroundings that endangered their physical or emotional well-being and that they had engaged in conduct or knowingly placed the children with persons who engaged in conduct that endangered their physical or emotional well-being. DFPS presented evidence that both parents were aware of the other's drug use, and even used drugs together, yet each continued to allow the other parent to care for the children. There was also evidence that Mother was aware of Father's criminal history and may have engaged in criminal conduct with him. The trial court could have reasonably concluded that evidence of one parent's conduct was relevant to the issue of whether the other parent had knowingly placed the children with persons who engaged in conduct that endangered their physical or emotional well-being as well as to the issue of the children's welfare with both parents and that these issues were sufficiently interwoven to justify a joint trial. *See Holmes v. Tex. Dep't of Protective & Regulatory Servs.*, No. 03-01-00325-CV, 2002 WL 1727384, at *2 (Tex. App.—Austin Jul. 26, 2002, pet. denied) (not designated for publication) (upholding trial court's refusal to sever when one parent's actions

13

were relevant to the grounds for terminating the other parent's parental rights); *In re Caballero*, 53 S.W.3d 391, 396–97 (Tex. App.—Amarillo 2001, pet. denied) (holding that the trial court did not abuse its discretion by denying severance when questions regarding the child's welfare under care of both parents were sufficiently intertwined).  We cannot say that the trial court abused its discretion in refusing to sever the issues, and we overrule Grandmother's third issue.

## 4.  Failure to grant a mistrial

In Grandmother's fourth issue, she argues that the trial court erred by not granting a mistrial after it failed to strike testimony regarding photographs that she alleges were improperly admitted.  We review the denial of a motion for a mistrial by an abuse of discretion standard. *See Schlafly v. Schlafly*, 33 S.W.3d 863, 868 (Tex. App.—Houston [14th Dist.] 2000, pet. denied).

"The admissibility of a photograph is conditioned upon its identification by a witness as an accurate portrayal of the facts, and on verification by that witness or a person with knowledge that the photograph is a correct representation of such facts." *Davidson v. Great Nat'l Life Ins. Co.*, 737 S.W.2d 312, 314–15 (Tex. 1987).  "The predicate for admissibility need not be laid by the photographer, the person photographed, or even a person who was present when the photograph was taken, but any witness who observed the object or scene depicted in the photograph may lay the predicate." *Kessler v. Fanning*, 953 S.W.2d 515, 522 (Tex. App.—Fort Worth 1997, no pet.).  All that is necessary is testimony from a

witness with personal knowledge that the photographs accurately depict what they are "claimed to be." Tex. R. Evid. 901(b)(1); *Kessler,* 953 S.W.2d at 522.

During trial, Mother was questioned about the trip to Nacogdoches. Mother testified that when Grandmother and Maria were leaving Mother's grandmother's apartment, Father walked out with his parents and Maria while Mother remained upstairs. The Maroneys showed Mother a picture of Father, Grandfather, and Grandmother, who was carrying Maria, walking down the front steps of a building. The Maroneys asked, "After looking at those pictures, ma'am, does that accurately depict the scene in Nacogdoches on that date and time that you are referring to?" Mother responded, "Yeah. I was upstairs visiting and they are leaving." Grandmother objected, and the trial court struck everything after "Yeah." The Maroneys then offered the photographs into evidence. Grandmother objected, and the trial court overruled the objection and admitted the photographs.

Later, outside of the jury's presence, Grandmother cross-examined Mother on her knowledge of the photographs. Mother testified that she was not in the pictures, was not present when the pictures were taken, and had no personal knowledge that they accurately depicted what they purported to represent. The trial court said,

> What we got here is a disputed issue of fact. At one point the witness says, yes, that it is an accurate depiction, which is the only requirement you have to do. They don't have to take the picture. They don't even have to be present when the picture is made. All[] they have to say is that it is an accurate depiction. And but on

15

redirect—or [Grandmother] makes a telling cross-examination, but that's what it is at this point. We have a witness that contradicts herself. The jury can decide which one is true. They stand admitted.

Grandmother moved for a mistrial, which was denied.

The trial court did not err in admitting the photographs. Mother testified she was in the apartment building at that time and had seen Father, Grandmother, Grandfather, and Maria leave at the same time. She testified that the photograph accurately depicted the departure. Further, Father testified that he walked out of the building with his parents and Maria.[6] Grandmother also testified that the photographs showed them leaving the apartment building and that she was "getting [Maria] away from [Father]." The photographs showed nothing more than what was established through Father and Grandmother's testimony. Thus, Grandmother did not demonstrate that the court's ruling was erroneous. *See Roberson v. Collins*, 221 S.W.3d 239, 243 (Tex. App.—Houston [1st Dist.] 2006, no pet.) (upholding court's ruling admitting evidence because the ruling was not erroneous and the appellant did not show that the ruling probably

---

[6]Father was asked,

> Q. Okay. Were there times that you were walking together when coming out of the building?
>
> A. Yes.
>
> Q. And why was that?
>
> A. Because my daughter was there and I refused to just walk away from her, you know. Like, I could put her in the car.

caused the rendition of an improper judgment). Because the photographs were properly admitted, the trial court did not abuse its discretion by denying Grandmother's motion for mistrial based on the photographs' admission. We overrule Grandmother's fourth issue.

**5. Hearsay**

In her fifth issue, Grandmother argues that the trial court erred in admitting evidence which contained hearsay. Ashton Moore, a conservatorship specialist for DFPS, had been assigned to Mother and Father's DFPS case in March 2011. During her testimony, DFPS offered Petitioner's Exhibit 45, the parents' Permanency Plan and Progress Report from January 2011. Moore was questioned,

> Q. And is that a stamped copy of a permanency plan and permanency progress report?
>
> A. Yes.
>
> Q. And was that part of your case file?
>
> A. It was.
>
> Q. And do you keep that in the normal course of business with—as a caseworker on that case?
>
> A. Yes.

Grandmother objected first as to hearsay, and the trial court overruled her objection. DFPS clarified that they were offering the exhibit as a business record. Grandmother further questioned Moore,

17

Q. Do you have personal knowledge as to who prepared that document?

A. I recognize the signatures.

Q. Do you know whether those people had knowledge of the actual facts that are reported in that?

A. They would have.

Q. Is that your opinion, or is that something you actually know?

A. That would be something I know based on my experience with [DFPS].

. . . .

Q. Were the notations in that document made close in time to the time the information was provided?

A. It would have been, yes.

Q. Is all that information provided by employees or people under the control of your department?

A. No.  It would have been provided by—it would have been compiled from reports we received from service providers and our experience with the family.

Q. So it would have been from outside providers that are not under the control of the Department?

A. It would have been from everybody.

Grandmother then objected that the file was an improper business record.  The trial court overruled the objection, stating, "It's similar to a business record."

On appeal, Grandmother argues that the trial court's comment that the file was "similar to a business record" means that the file did not fall within the

18

business records exception to hearsay. The business records exception has four requirements: (1) that the records were made and kept in the course of a regularly conducted business activity, (2) that it was the regular practice of the business activity to make the records, (3) that the records were made at or near the time of the event that they record, and (4) that the records were made by a person with knowledge who was acting in the regular course of business. *See In re E.A.K.*, 192 S.W.3d 133, 141 (Tex. App.—Houston [14th Dist.] 2006, pet. denied). Moore testified that the permanency plan was made and kept in the regular course of her business, that the records were made near the time of the events recorded, and that the records were compiled by a person with knowledge who was acting in the regular course of business. The permanency plan was thus properly admitted under the business records exception. Further, beyond the conclusory statement that the admission of the documents was "not without harm," Grandmother fails to demonstrate how she was harmed by the admission of the file. *See In re C.J.*, No. 04-06-00132-CV, 2006 WL 1751211, at *2 (Tex. App.—San Antonio June 28, 2006, no pet.) (mem. op.) (refusing to find error in the admission of the State's business records when the father did not explain how the admission of three exhibits resulted in harm in view of the evidence that was presented). We overrule Grandmother's fifth issue.

## 6. Incomplete record

In her sixth issue, Grandmother argues that the failure of the court reporter to provide a complete record is a reversible error. Grandmother claims that the

lack of the reporter's record for the hearing on DFPS's motion to strike Grandmother as an intervenor impeded her ability to present her first issue on appeal. The order on DFPS's motion states that a record of the hearing was made, but this court did not receive a record of that hearing. However, as we noted above, the trial court's order states that the trial court made "no finding regarding the intervention" at that hearing and "reserve[d] the determination of this issue to such time as the court determine[d] a final determination should take place." Grandmother also argues that the reporter's record of the hearing on the Maroneys' intervention was necessary for her second issue. The order denying Father's motion to strike the Maroneys does not recite that a record was made.

An appellant is entitled to a new trial under the rules of appellate procedure if she has timely requested a reporter's record, but through no fault of her own, a significant portion of the recording has been lost or destroyed, and the lost or destroyed portion is necessary to the appeal's resolution and cannot be replaced. Tex. R. App. P. 34.6(f). Grandmother timely requested the reporter's record. But there is no evidence that the record has been lost or destroyed. There is also no indication that a record was made of any hearing that may have taken place on Father's motion to strike the intervention of the Maroneys. Grandmother makes a slight reference to this in her sixth issue with no citation to support her position that a record ever existed or that it was lost or stolen.

But even assuming that the record is lost or destroyed, Grandmother has not demonstrated that the missing portion is necessary to the resolution of her

20

appeal. Regarding Grandmother's intervention, the trial court made no findings during or after the hearing, and Grandmother fully participated at trial. As to the Maroneys' intervention, we conclude that a review of a transcript that may never have existed was not necessary to our determination that the trial court did not abuse its discretion by denying the motion to strike the Maroneys' intervention. Because we were able to resolve Grandmother's first and second issues without the need of the missing reporter's records, Grandmother has not met the statutory requirements for a new trial under Rule 34.6(f). *See Gavrel v. Rodriguez*, 225 S.W.3d 758, 761 (Tex. App.—Houston [14th Dist.] 2007, pet. denied) ("If the missing portion of the record is not necessary to the appeal's resolution, then the loss of that portion of the record is harmless under the rule and a new trial is not required."). We overrule Grandmother's sixth issue.

**7. Testimony by the attorney and guardian ad litem**

In Mother's and Father's third issues, they argue that the trial court erred in allowing Deborah Boone, who served in the dual role of attorney ad litem and guardian ad litem for the children, to testify. An attorney serving in the dual role of guardian ad litem and attorney ad litem may not testify except as authorized by Rule 3.08 of the Texas Disciplinary Rules of Professional Conduct. Tex. Fam. Code Ann. § 107.007(a)(4) (West 2008). At trial, Boone requested to call herself to testify in the narrative. The court asked twice if there was any objection, and no one objected. Father only requested that Boone be sworn so that he could cross-examine her.

21

Generally, failure to object in the trial court waives the issue on appeal. *See* Tex. R. App. P. 33.1(a); *Bushell v. Dean*, 803 S.W.2d 711, 712 (Tex. 1991) (op. on reh'g). However, Mother and Father argue that allowing the guardian ad litem to testify is fundamental error. Fundamental error requires no trial court predicate for appellate review. *In re B.L.D.*, 113 S.W.3d 340, 350 (Tex. 2003), *cert. denied*, 541 U.S. 945 (2004). Fundamental error exists in those instances in which error directly and adversely affects the interest of the public generally, as that interest is declared by the statutes or constitution of our state, or instances in which the record affirmatively and conclusively shows that the court rendering the judgment was without jurisdiction of the subject matter. *Mack Trucks, Inc. v. Tamez*, 206 S.W.3d 572, 577 (Tex. 2006).

However, because of "strong policy considerations favoring preservation," the supreme court has called fundamental error "a discredited doctrine." *B.L.D.*, 113 S.W.3d at 350 (quoting *Cox v. Johnson,* 638 S.W.2d 867, 868 (Tex. 1982) (per curiam)). It is used only in rare circumstances, such as when the record shows on its face that the court lacked jurisdiction, and in juvenile delinquency cases. *Id*. The supreme court in *B.L.D.* noted that fundamental error is applied in juvenile delinquency cases based on the "quasi-criminal" nature of those cases and that "this rationale does not support applying the criminal fundamental-error doctrine to parental rights termination cases." *Id*. at 351 (declining to extend the fundamental-error doctrine to unpreserved charge errors in termination cases); *see also In re L.M.I.*, 119 S.W.3d 707, 708 (Tex. 2003), *cert. denied*, 541 U.S.

22

1043 (2004), (stating that in the context of parental rights termination, "adhering to our preservation rules isn't a mere technical nicety; the interests at stake are too important to relax rules that serve a critical purpose"). Courts have also declined to apply fundamental error to claims regarding constitutionality of termination proceedings. *See In re R.B.*, 225 S.W.3d 798, 802 (Tex. App.—Fort Worth 2007, no pet.) (holding that appellant parents' claim that termination of their rights was unconstitutional was not fundamental error and could not be asserted for the first time on appeal).

Father cites to *Willis v. Premier Ins. Co.*, 442 S.W.2d 912 (Tex. App.—Fort Worth 1969, no writ), for the proposition that allowing the testimony of a non-competent witness is an appropriate issue in which to apply the fundamental-error doctrine. *Willis* does not say that. *Willis* held that the trial court's dismissal of a case for a witness's willful failure to answer cross-interrogatories was not a fundamental error. *Id*. at 914. It was not fundamental error because, the appellate court stated, fundamental error is limited "to situations where (1) the public interest is adversely affected, (2) the trial court was without jurisdiction of the subject matter, [or] (3) the parties had no justiciable interest." *Id*. In that case, "[o]nly the rights of the plaintiff and defendant were involved. The public interest was not involved. The parties to the suit did have a justiciable interest. The court had jurisdiction of the subject matter." *Id*.

Likewise, we do not believe fundamental error is applicable here. The public interest was not involved and only the parties' rights were at issue. We

23

decline to apply the fundamental-error doctrine to this issue and we overrule Mother's and Father's third issues. *See In re S.G.*, No. 13-05-00155-CV, 2005 WL 1831962, at *1 (Tex. App.—Corpus Christi Aug. 4, 2005, no pet.) (mem. op.) (following *B.L.D*. and declining to apply fundamental-error doctrine in a termination case to an unpreserved complaint of "repeated references to uncharged acts of prostitution").

## 8. Statements by trial judge

In Father's second issue and Mother's fourth issue, they complain that the trial judge erred when he made a statement that Mother's behavior during trial was "important" for the jury to see. While DFPS's attorney was questioning Father about his drug use, she stopped in the middle of a question and said, "Your Honor, if I may, could you please ask [Mother] to refrain from her waiving of the papers and making comments?" The trial court responded, "No. I think it's important the jury see that." No party objected.

Mother and Father make different arguments regarding preservation of the issue. Mother argues that the trial judge's comment was fundamental error. Father argues that under rule 605 of the rules of evidence, no objection was needed to preserve the issue. *See* Tex. R. Evid. 605. Rule 605 states, "The judge presiding at the trial may not testify in that trial as a witness. No objection need be made in order to preserve the point." *Id*. However, the trial judge's statement in this case was not testimony; he did not testify as to disputed facts in this case, he commented on Mother's behavior during trial. *See In re M.S.*, 115

24

S.W.3d 534, 538 (Tex. 2003) (distinguishing judicial testimony from a judicial comment on the weight of the evidence but noting that both are forms of proscribed judicial influence). "[J]udicial remarks during the course of a trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge." *Dow Chem. Co. v. Francis,* 46 S.W.3d 237, 240–41 (Tex. 2001). Furthermore, expressions of impatience, dissatisfaction, annoyance, and even anger do not establish bias or partiality. *Id.* at 240.

Mother cites to *Blue v. State*, 41 S.W.3d 129, 132 (Tex. Crim. App. 2000), for the proposition that a judge's comments are fundamental error. *Blue* is a criminal case, and as we discussed above, fundamental-error doctrine has developed differently in civil and criminal case law. *See B.L.D.*, 113 S.W.3d at 351. Further, the judicial comment in *Blue* (stating to the jury that the defendant had considered a plea bargain) "vitiated the presumption of innocence" and could allow a juror to "assume that the judge [knew] something about the guilt of the defendant that the juror [did] not." *Blue*, 41 S.W.3d at 132. Such a comment is fundamental error because it cannot be rendered harmless by proper instruction. *See Dow Chem. Co.*, 46 S.W.3d at 241 ("[O]bjection to a trial court's alleged improper conduct or comment must be made when it occurs if a party is to preserve error for appellate review, unless the conduct or comment cannot be rendered harmless by proper instruction.") (citing *State v. Wilemon*, 393 S.W.2d 816 (Tex. 1965)). Both parents note only that the judge's comment

25

"communicat[ed] to the jury that [he] found Mother's behavior important." They do not complain that the comment communicated that the judge found Mother's behavior improper or indicative of her ability to protect and care for her children. Neither Mother nor Father present any argument that a proper instruction could not render the remark harmless. We therefore decline to apply the fundamental-error doctrine in this case, and we overrule Father's second issue and Mother's fourth issue.

**9. Best interest**

In Father's first issue and Mother's first and second issues, they argue that the evidence is factually insufficient to support the jury's finding that termination of their parental rights was in the children's best interest.

In reviewing the evidence for factual sufficiency, we give due deference to the factfinder's findings and do not supplant the verdict with our own. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). We determine whether, on the entire record, a factfinder could reasonably form a firm conviction or belief that the termination of the parent-child relationship would be in the best interest of the children. Tex. Fam. Code Ann. § 161.001; *C.H.*, 89 S.W.3d at 28. If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction in the truth of its finding, then the evidence is factually insufficient. *H.R.M.*, 209 S.W.3d at 108.

There is a strong presumption that keeping a child with a parent is in the child's best interest. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006). Prompt and permanent placement of the child in a safe environment is also presumed to be in the child's best interest. Tex. Fam. Code Ann. § 263.307(a) (West 2008). The following factors should be considered in evaluating the parent's willingness and ability to provide the child with a safe environment:

(1) the child's age and physical and mental vulnerabilities;

(2) the frequency and nature of out-of-home placements;

(3) the magnitude, frequency, and circumstances of the harm to the child;

(4) whether the child has been the victim of repeated harm after the initial report and intervention by the department or other agency;

(5) whether the child is fearful of living in or returning to the child's home;

(6) the results of psychiatric, psychological, or developmental evaluations of the child, the child's parents, other family members, or others who have access to the child's home;

(7) whether there is a history of abusive or assaultive conduct by the child's family or others who have access to the child's home;

(8) whether there is a history of substance abuse by the child's family or others who have access to the child's home;

(9) whether the perpetrator of the harm to the child is identified;

(10) the willingness and ability of the child's family to seek out, accept, and complete counseling services and to cooperate with and facilitate an appropriate agency's close supervision;

(11) the willingness and ability of the child's family to effect positive environmental and personal changes within a reasonable period of time;

(12) whether the child's family demonstrates adequate parenting skills, including providing the child and other children under the family's care with:

(A) minimally adequate health and nutritional care;

(B) care, nurturance, and appropriate discipline consistent with the child's physical and psychological development;

(C) guidance and supervision consistent with the child's safety;

(D) a safe physical home environment;

(E) protection from repeated exposure to violence even though the violence may not be directed at the child; and

(F) an understanding of the child's needs and capabilities; and

(13) whether an adequate social support system consisting of an extended family and friends is available to the child.

*Id.* § 263.307(b); *R.R.*, 209 S.W.3d at 116.

Other, nonexclusive factors that the trier of fact in a termination case may use in determining the best interest of the child include:

(A)   the desires of the child;

(B)   the emotional and physical needs of the child now and in the future;

(C)   the emotional and physical danger to the child now and in the future;

(D)   the parental abilities of the individuals seeking custody;

(E)   the programs available to assist these individuals to promote the best interest of the child;

(F)   the plans for the child by these individuals or by the agency seeking custody;

(G)   the stability of the home or proposed placement;

28

(H)   the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and

(I)   any excuse for the acts or omissions of the parent.

*Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976) (citations omitted).

These factors are not exhaustive; some listed factors may be inapplicable to some cases; other factors not on the list may also be considered when appropriate. *C.H.*, 89 S.W.3d at 27. Furthermore, undisputed evidence of just one factor may be sufficient in a particular case to support a finding that termination is in the best interest of the child. *Id.* On the other hand, the presence of scant evidence relevant to each factor will not support such a finding. *Id.*

**The evidence**

Abigail was four years old at the time of trial, and Maria was almost two years old. *See* Tex. Fam. Code Ann. § 263.307(b)(1). Father's criminal history dates back to 2005. *See id*. § 263.307(b)(3). In June 2005, he was charged with an accident involving damage to a vehicle. In September 2005, he was charged with criminal trespass of his girlfriend's house. Father was charged with failure to appear on the previous charges in December 2005. In June 2006, he was charged with evading arrest. He received probation, which was revoked after two assaults on officers. He served ninety days in jail for the assaults starting in October 2006. In 2008, Father served 40 days for driving while intoxicated.

On February 11, 2009, police were called to Mother and Father's house for a complaint of a domestic dispute. The parents admitted that marijuana was in the house, and a search revealed drug paraphernalia in the bathroom. Mother admitted that the paraphernalia was hers; Father denied owning any of it. Mother was arrested at that time for possession of marijuana.

Mother and Father were arrested in Round Rock, Texas in March 2011, after being found asleep in their vehicle. Father testified that he did not recall being found unconscious in his car, but he remembered waking up in jail. The police had found a needle, a pill bottle, and two soft drink cans with a black substance in or on them. The police also found $3,500 in one hundred dollar bills in Mother's purse. Both Mother and Father were later indicted for felony possession of heroin and cocaine after the substances were tested. At the time of termination, the charges were still pending.

Amanda Hoon, the assistant manager of a Buckle store in Vista Ridge Mall, testified at trial that in March 2011, Father ran into the store, grabbed handfuls of clothing, and ran out of the mall. Hoon followed him outside, where she saw him get into a white Nissan Sentra. She jumped in the car after him. Father pushed her out, and the car ran over her leg. The Buckle manager also followed Father out and saw that he had a knife on him. Father and the driver escaped, but a witness got the license plate number of the car.

In June 2011, Mother and Father were cited for criminal trespass at a Wal-Mart for allegedly switching the tags on some bicycles. Father testified they were

30

"[j]ust playing around." The police officer called to the store testified that Mother and Father told him that they had switched the tags on some bicycles, but they had paid the correct price for the bicycles that they had purchased. The officer discovered that Father had an outstanding warrant for the robbery at the Buckle store, and he was arrested. Father had a felony indictment for aggravated robbery pending at the time of trial. The officer described Mother as "argumentative" while he was arresting Father.

Dr. Mark Foster completed the psychological evaluations of Mother and Father. *See id.* § 263.307(b)(6). His report on Father noted that Father provided inaccurate information regarding his criminal history and that Father was "frequently evasive in answering questions." He testified that Father's results indicated "somebody [who] has a number of significant antisocial personality features." He described Father's responses as similar to people who are "immature, narcissistic, and self-indulgent" and noted that Father is probably viewed by others as "irritable, sullen, and argumentative." Dr. Foster described people with similar results to Father's, stating,

> They are very high risk of abusing substances. They tend to focus on their needs to an excessive extent. They tend to have very poor impulse control. They tend to be very unreliable and have difficulty maintaining employment. They have a lot of conflict in their relationships, particularly within their relationships with persons that are perceived as authority figures. It might be parents. It may be law enforcement. That sort of thing.

Dr. Foster said that this type of people seek treatment for their behaviors as "an attempt to avoid the consequences of their actions." He reported "a poor

31

prognosis for recovery" and that people like Father "are frequently asked to leave substance abuse treatment programs due to persistent denial of their treatment issues or rules violations." He expected that short-term treatment would not be effective for Father, and he defined short-term as "a couple of years." He stated that Father is "probably unrealistic and grandiose in his self-appraisal" and would be "unlikely to be receptive to traditional counseling or psychotherapy."

Dr. Foster testified that turning to heroin "is not a normal response to having your children removed," and that such behavior "would confirm the test results, that this is somebody that has very poorly developed coping skills." As for Father's parenting abilities, Dr. Foster testified,

> I would expect him to have a lot of difficulties meeting the responsibilities of being an effective parent. I would expect him to behave irresponsibly, to put his needs before the needs of the child. I would expect a great deal of moodiness which would undermine the child's security. I would expect him to place the child at risk.

Father did not disclose to Dr. Foster that he was taking methadone. Dr. Foster stated that Father was "unable or unwilling to acknowledge how his substance misuse impair[ed] his ability to provide a safe and nurturing environment for [Maria]. His substance misuses pose[d] a significant risk to [Maria]'s safety." Dr. Foster noted that although Father was in treatment, there was "little evidence that [Father's] denial of his substance misuse issues [had] been addressed."

As to Mother's test results, Dr. Foster testified that Mother's IQ was "at the bottom of the average range." Mother's reading skills were between the ninth and tenth grade level, and "her responses reflected a very high risk of continued

32

substance abuse use, [and] a good deal of denial with regard to her substance abuse issues." He described Mother's personality as "more of a narcissistic personality, meaning . . . a personality characterized by high level of immaturity and self-centeredness." He testified,

> Narcissistic individuals have a great deal of difficulty appreciating how their choices affect others, particularly children. Their needs tend to come first. They tend to abandon their responsibilities very quickly. One thing that's consistent with antisocial personality features is they also are very unlikely to seek treatment on their own accord; that is, they usually enter treatment as a result of pressure from family, friends or the authorities.

> Dr. Foster testified that Mother did not indicate to him that she believed

she had a substance abuse problem. He noted that Mother

> maintain[ed] a high level of denial with regard to her substance misuse issues and its impact on her ability to parent effectively. Her continued denial despite being arrested on substance and possession charges is reason for concern. Her failure to complete the conditions of her probation is also reason for concern. There is a high risk of relapse among persons with her pattern of responses in history. It is common for persons like [Mother] [to] be asked to leave substance use treatment programs due to their lack of cooperation. Her negative treatment attitudes pose a significant risk to both her safety and that of her children.

Dr. Foster also reported, "It is common for persons like [Mother] to abstain from substance misuse while [their] behaviors [are] being monitored by the authorities. These periods of sobriety may lead others to believe that her behavior has changed only to find that she will relapse once her legal difficulties have subsided."

He believed that Mother and Father's relationship was "probably very unstable." He believed that, as parents, he would "expect a high risk of neglect" of the children. In order to effect change, Dr. Foster expected that Mother and Father would need "many months, if not many years" of counseling. He said that continued arrests were an indication that the parents were not making progress.

When Father was asked if he had ever been verbally abusive to Mother, or if she had ever been verbally abusive to him, he responded, "I mean every couple gets into fights." *See id.* § 263.307(b)(7). He denied any physical abuse between them. He also said that he would never fight with Mother in front of the children. Mother also testified that although they had fights "like every couple," there was no violence between her and Father.

Stephanie Kolb, a DFPS investigator, testified that she witnessed a physical altercation between Mother and Father at a court hearing. Mother shoved Father in the courtroom. Ex-Husband also testified to an instance in the courtroom when Mother hit him after learning that her children were being removed.

Mother testified that Ex-Husband fractured her arm in a fight that occurred in front of Abigail. Ex-Husband testified that Mother was angry at having to pick up Abigail and that she vandalized his car and started swinging at him. Mother called the police and told them she had broken her arm, but Ex-Husband testified that Mother never went to the hospital, and never had a cast or any other evidence of a broken arm. Ex-Husband was charged with a Class C

misdemeanor of criminal mischief for vandalizing the hood of Mother's car by striking it with his fist. Ex-Husband testified that Mother had thrown dishes at him "[a] couple of times."

Father's testimony regarding his drug history was inconsistent.[7] *See id.* § 263.307(b)(8). He testified that he did not use drugs prior to the children's removal. He also testified that prior to 2009, he had "no issues" with drugs, although he did admit to having used drugs by that time. From age sixteen to twenty-two, Father used marijuana and drank alcohol. He also admitted to telling First Steps that he used ecstasy at age sixteen. He did not recall telling First Steps that he had used mushrooms, cocaine, and opiates.

When DFPS first visited Mother and Father in July 2010, it asked the parents to take drug tests. The parents refused. Father testified that he now regrets refusing the drug test.

Father testified that he had used cocaine and heroin in the past two years and had used methamphetamine once. He stated that he used heroin before Mother was pregnant with Maria and again after Maria had been removed from their home. Maria was removed on October 12, 2010, and Father tested positive

---

[7]Father testified that he has an anxiety disorder that interferes with his memory. He said that he was not currently on medication for the disorder because of his methadone treatment. He later testified that he did not think he had ever been diagnosed with any kind of disorder. He then testified that he had been on Klonopin or Clozapin prescribed by his family doctor for anxiety before he met Mother. Dr. Foster testified that Father tested as having very low anxiety scores. Dr. Foster said that no anxiety disorder was evident from Father's test results.

for methamphetamine and cocaine on October 13, 2010. At trial, he said that he did not know anyone who sells drugs or where to go to buy drugs. He claimed that Mother had no idea that he was using drugs. At trial, Father agreed that turning to drugs was an inappropriate way to react to his child's removal.

Father testified that between July and October 2010 was the first time he had used drugs in years. Father also tested positive in May 2011, which he claims was the result of drug usage in March 2011. On March 1, 2011, Round Rock police officers found Mother and Father asleep in a car in the parking lot of a hotel. The officers found a coke can turned upside down in the center console with a "black tar substance" on it, which the officers believed was heroin.

Father said that he did not know how much heroin he was using before he went to the methadone clinic, or how often he was using. He testified, "I don't recall. I mean, it was a problem, I know that." Father went to First Steps in April 2011 to have his drug and alcohol evaluation. He told First Steps that he did not use drugs and he had only tested positive for marijuana once two years before. He testified at trial that what he had told First Steps was untrue. Father first told Moore that his clean date was March 15 or 16, 2011. He later changed it to March 21, 2011.

Father testified that he had been using cocaine and heroin together, and that the services he was receiving at the methadone clinic were sufficiently treating his addictions, and that he was getting counseling through the clinic. Father testified that he was not attending AA or NA meetings.

36

The First Steps counselor said she had concerns about Father's honesty. She testified that Father was "guarded regarding the history of alcohol and drug use, [and] he was irritable during the process." She testified that Father attended only nineteen of forty-two group sessions and only two individual counseling sessions. She described Father as initially "very irritable" and said that he had the mentality that people were picking on him. She said that Father would get very angry, and that he would curse and walk out of sessions. Father was eventually discharged as unsuccessfully completing therapy for lack of attendance.

Mother testified that she started using heroin after her children were removed. Although a bag of marijuana was found in her house on February 11, 2009, she denied using at the time. She later clarified, "I meant at the time that that happened, that the incident happened, I was not under the influence." She claimed that she used the marijuana alone and not in the house. Mother testified that she smoked on the patio. The police officer who was called to her house in February 2009 testified that Father told him that Mother smoked in the restroom.

Mother admitted at trial that she should not have turned to drugs when her children were removed. Mother told First Steps that she had been taking valium for two and a half years, starting in the summer of 2008. At trial, she said that she wrote down that she was using valium because she thought it was the same thing as hydrocodone.

Mother testified that she had been prescribed hydrocodone and was still taking hydrocodone when she started using heroin. She testified that she was not addicted to hydrocodone or any other drug until December 2010. She said that she told Denton Treatment Services that she had been addicted to drugs for two years because she was told that they would not help her unless she had been addicted for at least that long.

The First Steps counselor testified that she heard Mother's testimony that she had not been addicted to drugs until December 2010, and she testified that was different from what Mother said in her group sessions at First Steps. The counselor testified that Mother told her she was using heroin daily with Father, and that Mother was afraid that she would die if she continued using at the rate she was currently using. The counselor said that she was concerned with Mother's credibility.

At First Steps, Mother told the counselor that she had been taking valium daily for two and a half years. The counselor testified that such an amount for that period of time would indicate a "high probability" of addiction to valium but that methadone would not be used to treat a valium addiction. The counselor said that she first recommended a supportive outpatient program for Mother, which is a less intensive program than the intensive outpatient program. But after Mother admitted to more drug use, First Steps increased the level of suggested treatment to intensive outpatient.

At trial, Mother said, "I honestly believe that I feel that I have successfully overcome my addiction." She then explained that she knew she was not done with treatment, but that she has successfully stopped using drugs. The First Steps counselor testified that Mother and Father were improving at the time they were discharged, but that they had a long way to go.

Mother tested positive for ecstasy in August 2010. When Father learned the results of Mother's drug test, he laughed and said that someone must have put something in Mother's drink while she had been working as a waitress in a strip club. Moore testified that the levels of creatine in the parents' drug tests concerned her that they were possibly trying to hide their drug use.

Dr. Ann Arcuri was the therapist at Denton Treatment Services, the methadone clinic that Mother and Father were using. Dr. Arcuri testified that at least a one-year history of opiate dependence is required for admittance to the methadone treatment program at Denton Treatment Services. Father told her that he had been addicted to heroin for three years. Mother reported to her that she had a two-year history of dependence. Mother and Father met with Dr. Arcuri once a month, which Dr. Arcuri testified was not often enough to make a change. Dr. Arcuri said that counseling once a month is the minimum requirement to stay in treatment, but a patient would need to be in therapy at least once a week for fifty minutes to make a change. She testified that she had asked Mother and Father to come in more frequently, but they refused. She said that she expects patients to stay for fifty minutes, but Mother and Father would

39

only stay for ten minutes. Dr. Arcuri said that there has been "a slight improvement" with Mother. Mother testified that she talks with Dr. Arcuri "a couple times a week" and that she stays in the session until Dr. Arcuri tells her that her time is up.

Mother told Dr. Arcuri that she was excited to start methadone treatment because "her heroin usage was out of control." Dr. Arcuri has had trouble getting Mother to attend counseling, however. On June 27, 2011, Mother went to the clinic and was told that she could not receive methadone until she had attended a counseling session, because she had not attended any counseling that month. Mother told the counselor that she did not have time and did not want a counseling session. When the counselor insisted, Mother said, "Fuck off, bitch. I'm in a bad mood."

Mother testified that in addition to the counseling at Denton Treatment Services, she was in intensive outpatient treatment and seeing a therapist. Mother testified that she had informed Dr. Arcuri that she had been seeing other counselors but that Dr. Arcuri must have forgotten that conversation.

Mother testified that she looked for NA and AA meetings while living in Nacogdoches but could not find any. She did not look for meetings in Austin, but she has "occasionally" attended some meetings since returning to Denton. Mother defined "occasionally" as "a couple of times a month. I mean I just—I go every now and then." When asked about the number of times she attended a meeting in the three months preceding trial, Mother could not give a number.

40

She did not have a sponsor by the time of trial and had not started working the steps.

Mother was asked about the drug test she failed when her children were removed. She said the result was the consequence of making "a bad decision to work somewhere [she] shouldn't have." She was further questioned about her marijuana use and her addiction to heroin and hydrocodone, and she responded, "I know I've done stuff that's wrong."

Mother testified that she did not believe she failed to comply with DFPS in their investigation or that she failed to comply with her court-ordered service plan. *See id.* § 263.307(b)(10). The DFPS investigator, Stephanie Kolb, testified that Father was "[v]ery, very hostile" to her during her investigation. She said that Father would yell at times and was "over-the-top with emotions."

Moore testified that Mother would not return her calls and that Moore set up three different appointments to meet with Father but he did not show to any of them. Moore sent Father an email asking for information, and he responded "that he [was] not going to do [her] job for [her]. Since [she] was making his life hard, he was going to make [her] life hard." Moore testified that less than a month and a half before trial, Father told Moore that he was moving to Austin, and Moore asked him where he was living so she could transfer his services. Father told her that he did not know his address. When she asked where he would be working, he told her that she did not need that information. Moore testified that twice she had to go to court to get information from him. When

41

Moore asked Mother and Father about whether they had seen Maria on an unapproved trip to Nacogdoches, they "both immediately said no," which Moore knew was not true based on pictures she had of Father walking with Grandmother, Grandfather, and Maria.

When DFPS first visited Mother and Father in July 2010, it asked the parents to take drug tests. The parents refused. Kolb decided not to keep Maria with Father because "[t]here was a very big concern of his protectiveness and due to the behaviors that he exhibited. He made it very clear he did not believe that our drug test was true and made a comment that even if it was, what's—what's the big deal." Kolb discussed with Mother the option of voluntarily placing the children somewhere, but Mother "did not see the need for it so [she] was not going to do that."

Moore testified that Mother and Father failed to show up for a number of drug tests. Father testified that he had been ordered to participate in a drug and alcohol assessment in October 2010 but that he did not complete the assessment until April 2011. Father testified that he moved to Austin in late December 2010 but did not get the 2054 forms to start his services there until April 2011. He claimed that Moore was supposed to call him with information, but that he never heard from her. The First Steps counselor testified that Father told First Steps that he was transferring his services to Austin. The counselor said that Father's files would have been transferred to Austin on request but that he never told her where he would be receiving treatment in Austin.

42

Father claimed that he was unable to keep a fulltime job and attend all the classes he was required to attend at the same time. So, in April 2011, he quit his job and returned to the Denton area to complete his services. Father testified that he took parenting classes that he paid for on his own because DFPS did not pay for them.

Mother did not complete her drug and alcohol evaluation until January 2011. Mother did not schedule her psychological evaluation with Dr. Foster until February 2011. She testified that she did not receive recommendations based on her evaluations to complete more services until April 27, 2011, which was about six and a half months after her case had started.

Moore testified that Father was scheduled for an appointment for his psychological exam in March 2011, but that Father did not show up. Father testified that he did not make an appointment to see Dr. Foster until June 2011. He claimed that at the appointment, he filled out some paperwork but that Dr. Foster did not talk to him at all, and he never heard from Dr. Foster after that. Dr. Foster testified that he and Father spoke for about forty-five minutes.

Mother testified that she informed her caseworker when she moved and went to the DFPS office in Nacogdoches "a couple of times trying to talk to somebody." Jocelyn Watkins, a DFPS supervisor, testified that services were set up in Nacogdoches and that Mother had a caseworker assigned in Nacogdoches. Julie Westlake, a supervisor for DFPS investigators, testified that Mother and Father moved so often towards the end of the case that the

43

Department lost track of them. Kolb testified that they were unable to contact Mother for about three weeks. Westlake said that DFPS wanted another drug test from Mother, but it was never able to get it. Kolb testified that on August 27, 2011, she went to Mother and Father's house to look for Mother. She saw cars in the driveway, but no one would answer the door.

Mother testified that while she was in Nacogdoches, she made efforts to complete her services. She said that every time she would drive to Denton for visitation with her daughters, she would try to schedule appointments such as her psychological evaluation and her drug and alcohol evaluation. Kolb testified that she could not verify that Mother was living in Nacogdoches and that she had no "communication" with Mother or Father about setting up services there.

Mother testified that in January 2011, she was still in denial about needing help for her drug addiction, and that is why she lied on her First Steps intake. Mother only attended twenty-four of the forty-two group sessions offered through First Steps. Mother testified that she missed some sessions because they interfered with her GED classes. The First Steps counselor testified that Mother did make progress "at one point." The counselor testified that Mother initially fell asleep in class and refused to attend sessions without Father. First Steps recommended that Mother attend the women's group sessions. The counselor testified that initially Mother would only attend group sessions with Father, and Mother said it was because of transportation problems. Mother and Father were both discharged from First Steps for lack of attendance.

Father admitted that his frequent moves "probably played a part" in DFPS's difficulty in setting up his services. Mother testified that when she informed DFPS that she and Father were moving back to Denton and that they wanted to complete parenting classes, DFPS told them that because they were moving to terminate the parents' rights, the Department would not pay for parenting classes or Father's psychological evaluation. Mother testified that she and Father enrolled in the Love and Logic Parenting Class at First Steps on their own initiative. Mother also enrolled in a GED program at her own cost.

Moore testified that the parents attended appointments "sporadically" but that their "behaviors and attitudes had not changed in regards to the reasons the children came into care." *See id.* § 263.307(b)(11). Father was asked, "Do you remember telling the Court—being hostile and telling the Court numerous times that [DFPS] had no reason to be involved in your life?" He responded, "I'm sure I said that."

Father testified that he has been drug-free for approximately six months, since he started attending Denton Treatment Services. He said, "I feel I'm a totally different person as to how I was when I was rebelling after high school. I mean, totally different. I don't do anything wrong. I don't even have any friends. I mean, me and [Mother] are the only people we talk to." He says that he no longer socializes with his previous friends because they were a "[b]ad crowd."

Mother testified that she had not paid any child support by the time of trial. *See id.* § 263.307(b)(12). She testified that she smoked while pregnant with

Maria, and, by the time of trial, had not yet been able to quit smoking completely. Mother testified that she believed she was on time to all her visitation, "give or take maybe five minutes." Moore testified that at a visitation in April, Mother "appeared to be very sleepy, very tired, her speech was slurred and slow. And it was concerning that she may be under the influence of something."

Father testified that he worked as a welder and made $23 an hour, so he could use his wages to pay for the children's needs. *See id.* § 263.307(b)(12)(A). Moore testified that she saw improvement in the types of foods that Mother and Father brought to visits.

Father testified that he loved Maria "more than words can explain" and that she loves him too. *See id.* § 263.307(b)(12)(B). He believed he and Mother had the ability to properly care for Maria. He testified that when DFPS removed the children from his care, the house was "spotless" and the children were healthy and clean. Father testified that he did not remember any occasion where he was admonished for his behavior at visits with his child. He said he had always been on his best behavior.

Mother testified that she learned the love and logic style of parenting, a "style of parenting where you allow your children to make more choices and you give them a lot of choices to make and let them make good decisions and a lot of positive reinforcement."

Moore testified that of the visits she observed, there were "only one or two visits [that] [she] would classify it as an appropriate visit." *See id.* § 263.307(b)(12)(C). She testified,

> There was a visit where [Father] brought Pop-It fireworks to the visit and attempted to pop them indoors. There was a visit when [Father] was giving [Maria] Dr. Pepper in her sippy cup, was asked not to do it. He informed us not to tell him how to parent.
>
> . . . .
>
> A following visit, he attempted to do that again. I informed him his visit would end if he continued to give her Dr. Pepper. He then tried to give her Dr. Pepper and then he refused to leave the visit room, where I had to tell him I was going to call the police if he did not leave the building.

Moore said that when Father got irate, Abigail hid under a table. When Moore told Father that she was going to end his visit, Father told her that "his mother had custody of the child, and she was the only one that could tell him what to do."

Mother and Father testified that Mother's family was not very supportive of them. *See id.* § 263.307(b)(13). Mother called her mother a "pill head." Moore testified that Mother's mother was not a suitable placement for the children because of her "mental instability." Ann Maroney testified that Mother's mother was "very unstable at this point, and she [was] involved with some prescription drugs. She's also married to a meth addict."

Ex-Husband testified that he believed that Grandmother and Grandfather "enable a lot of things, maybe not directly or intentionally, but [he] think[s] they

47

have enabled unintentionally." Grandmother and Grandfather owned the house that Father rented and the car on which Father made payments. Father paid Grandmother $2,000 a month, which covered his rent and car payments. Father testified that Grandmother bonded him out of jail after his arrest in Round Rock for possession of controlled substances and for the aggravated robbery. Mother testified that Grandmother provided a lot of support, including toys and clothes for the girls. Grandmother testified that in early 2011, she had not heard from Mother or Father for "awhile" and searched online to find out if they had been arrested. Grandmother did not have a discussion with Mother or Father about the arrest after she found out about it.

Police officer John Martinez testified that he was called to investigate the robbery at the Buckle store. A witness identified the license plate of the car used in the robbery, and Officer Martinez discovered it was Grandmother's car. He called Grandmother and asked for Father's address, but Grandmother said she did not know it.

Grandmother asked Father about his arrest on June 16th, 2011, but at trial, she said that Father "did not understand why he was arrested." Grandmother said that the information in the police report regarding Father's arrest was concerning, but she did not have concerns about Father's parenting abilities based on his criminal history over the months preceding trial. When asked if she thought Father had engaged in dangerous conduct through drug use or criminal conduct, she said, "I believe it's possible." She did not believe that

Father had put Maria in danger by doing drugs during the course of the case. She testified that although she had never seen signs of drug use from Father, she would make him take drug tests to know if he was using drugs in the future. She said that she knew Father would comply with requests for drug tests because she had made him take them before.

Patience Galindo, the kinship development worker for DFPS, testified that Grandmother told her that she did not believe that her son was using drugs and that she had never seen any sign of drug use, despite the parents' previous positive drug tests. She thought that Grandmother appeared unwilling to accept what was going on with her son. She testified that Grandmother said "many times that she didn't understand why she had to follow the rules that [DFPS] set forth because she had custody of [Maria]. And it had to be explained to her that she did not have custody of [Maria], she had placement." Galindo testified that a person cannot be protective of a child if they do not believe what is happening to the child.

Grandmother paid for both parents' methadone treatment. She said that when Mother asked her to pay for her treatment, Grandmother did not ask what kind of drugs Mother was using. When asked what drugs she thought Mother and Father might have been using, she said, "I had no idea and I did not care. I just knew they needed help." She testified that she did not see methadone as a serious drug. She said, "I would see it as treating, like a headache, treating." Grandmother testified that she had never received a copy of the service plan that

49

Mother and Father were required to complete, that she did not know whether they were working their services or not, and that it was not a concern of hers to check that they were making progress.

Father testified that Grandmother and Grandfather took Maria to Nacogdoches to visit Mother's grandmother. Father said that Grandfather dropped Grandmother and Maria off at Mother's grandmother's apartment and then met up with Father and Mother at the storage unit. Mother and Father then returned Grandfather back to the apartment where Grandmother and Maria were. However, Grandmother testified that she, Grandfather, and Maria met Mother's mother at the storage unit. After unlocking the storage unit for Grandfather, Mother's mother drove Grandmother and Maria to Mother's grandmother's apartment.

When Mother and Father arrived at Mother's grandmother's apartment, they stood in the hallway while Grandmother gathered her things inside the apartment, and walked past Mother and Father with Maria on her way to the elevator. Mother found Maria's sippy cup in the apartment and brought it down to the parking lot to give to Grandmother.

Mother testified that DFPS never said they could not go to Nacogdoches, only that they could not all go together. Grandmother testified to the same thing. Grandmother testified that she was never told that she needed to notify DFPS of any unplanned interactions between the parents and Maria. Galindo testified that Grandmother was told in both permanency conferences that she needed to

report unplanned interactions. When Grandmother returned from Nacogdoches and was asked if Mother and Father had visited Maria, she told the Department no. She did not tell DFPS that she had passed them in the hallway accidentally. Grandmother said that she was angry at Mother and Father for going into the apartment building and that she talked to them about it later, but she did not remember what their responses were.

Moore testified that Father told her that DFPS had previously allowed visits outside of standard visitation, which concerned Moore. Moore also said that she told Grandmother that the parents could not go to Nacogdoches because they had not been working their services. She testified that Grandmother was not able to control Father during visitation.

Grandmother testified that Maria was always "elated" to see her parents at visitation. *See Holley*, 544 S.W.2d at 371–72. The guardian ad litem testified that Abigail talks less about Mother now than she used to. Ex-Husband testified that Mother missed visitation with Abigail for the first half of the case, which made Abigail upset. *See id*. He said that since Maria had been placed with the Maroneys, the girls get to see each other much more often. He testified that if Maria stayed with the Maroneys, he would be able to maintain a relationship between the two children.

Ex-Husband testified that Abigail told him about fights she witnessed between Mother and Father. *See id*. He felt that Mother did not take appropriate

51

steps to prevent Abigail from exposure to fights. Ex-Husband was concerned about Mother and Father exposing Abigail to verbal abuse and physical violence.

Maria was placed with the Maroney family after being removed from Grandmother. Ann Maroney testified that she was thirty-four years old and was a stay-at-home mom to Maria and her two other children, who are thirteen and eleven years old. She said that her children love Maria and that Maria calls them Sissy and Bubba. Ann has been married to Bob for sixteen years, and they have a large, five-bedroom, three-and-a-half-bath house.

Ann testified that there was tension between her and Mother because of a tense relationship that Ann had with Mother's mother. Ann said that while Mother lived with them, Mother would stay out late with Abigail, while pregnant with Maria, and return home between 1:00 and 3:00 in the morning. Mother would get up

> anywhere between 12:00 and 1:00 o'clock in the afternoon. She would grab [Abigail] a package of Teddy Grahams and herself a Coke and go outside and smoke a cigarette and talk on the phone for probably a good hour. And then she would come inside—come inside and she would get herself ready, and then she would leave.

Ann said that she met Father once and "wasn't very impressed." Ann said that she never spoke to Mother about Mother's behavior while Mother was living at her house because "you have to be careful with what you say to her. She gets—she gets mad very easily." Ann described a time when Abigail would not put her shoes on and Mother screamed at her so loudly it frightened Ann's children.

Ann said that when Maria was born, she sent Mother a congratulatory text message. Mother responded that "if [Ann] had a problem with her mom, then [Ann] had a problem with her and to basically go to hell and never contact her again." Ann testified that she blocked Mother's number on her cell phone in January 2010 because she was "getting harassing text messages at 2:00 or 3:00 o'clock in the morning, one after another, after another, after another."

Mother testified that she was "[m]ost definitely" concerned about Maria living with the Maroneys. *See id*. She said that she was concerned that the Maroneys would not treat Maria as well as their other children. Mother said that the last time she talked to the Maroneys, they told her they were blocking her number.

Father testified that he believed he was a better parent than the Maroneys. Father said that the Maroneys had never called Mother or tried to see Maria until she was placed in their home by DFPS. Father testified that when Mother was living with the Maroneys, they refused to feed her. He said that Mother left the Maroneys' house and moved in with him and his parents "for that specific reason." Father said that Mother only lived with the Maroneys for two weeks.

Mother testified that when she lived with the Maroneys, they "made [her] feel really unwelcome with [her] daughter." She said,

> I mean they wouldn't let her—she would like to carry around her sippy cup. They had hardwood floors. They wouldn't let her carry it around. They didn't want her to be able to have snacks. They didn't want her to bring any of her toys downstairs. I constantly just—I

53

mean I felt like I just needed to stay upstairs and hide from them because of all the rules that they had.

Ex-Husband had observed the Maroneys and Maria together, and he testified that the Maroneys "seem[ed] to be great parents." He said that their house was well-kept and that Maria was always properly groomed. Ex-Husband testified that Mother would sometimes tell Abigail that it was DFPS's fault that Mother missed visitation.

Moore testified that she has observed the Maroneys with Maria. She said that Maria gets along well with the Maroneys' other children and that Maria's grooming was always fine. Moore believes that Maria's best opportunity for success was with the Maroneys because "[t]he [Maroney] household is willing to provide permanency and stability for the child. The [Maroney] household is also protective."

Father testified that he believed that Mother was a very good parent and that she "care[d] about her kids a whole great deal." Maria's nursery nurse when she was born testified that she was concerned about Mother's bonding with Maria because Mother would not request to see Maria. The nurse testified that the only time Maria was taken out of the nursery was when Mother's mother was visiting. The nurse said that Mother would not maintain eye contact with her or speak to her.

Mother testified that Father was a good father. She said,

He was always very attentive. I mean it's just—it was so obvious that he cares about her more than anything in the entire world. I knew

54

before I even had [Maria that] he was going to be a good father, the way that he cared for [Abigail], and [s]he wasn't even [his] biological daughter.

Mother testified that Ex-Husband was a good father who had never done anything to hurt a child. She had no fear that Ex-Husband would use drugs in the future, despite having used drugs in the past. She believed that Ex-Husband made appropriate decisions regarding the people he allowed to be around his daughter. She agreed that, at the time of trial, he was in a better position to decide how often Abigail should be allowed to see Mother.

Ex-Husband testified that he had concerns about Father being around Abigail because of a "drug environment." He had asked Mother if Father was still using drugs and Mother had "swor[n] to [him] and [had] promised [him] that [Father] was different, he didn't mess with that anymore." Ex-Husband said that Abigail attends preschool five days a week and that she is doing "great" in school. He thought that when he first got possession of Abigail during this case, she might have been behind in some of her development, but that he believed she had surpassed where she should be intellectually. He said that Abigail loves arts and crafts and to go fishing with her half-brother. Abigail and her half-brother "love each other to death."

Ann Maroney testified that she and her husband would like to adopt Maria. Ann testified that she would like to put Maria in counseling at some point to help deal with the loss of her parents. Ex-Husband would like to be solely responsible for Abigail's safety and welfare.

Father testified that he believed his wages were enough to support a family.  *See id*.  He said that Mother would care for the children while he was at work.  Mother explained her plan for her children,

> I would love to be able just to be there with them.  I wasn't there when [Maria] took her first steps.  I wasn't there when [Abigail] got her ears pierced.  I missed out on my children's like moments in their lives.
>
> I just—I want to be able to be a mother to them.  I mean I would like to put them—you know, if I were to get them back, I would like to keep [Abigail] in whatever preschool she's in, to minimize change.  I would keep [Maria] in whatever daycare program she's in to, you know, minimize change for her for social, you know, so that she can socialize with other kids and stuff.  I would love to be able to take the kids to church with me.
>
> I mean since my—I've refrained from my addiction, I've started going to church again, [Father] and I have, [to the] Village Church in Denton.  I would like to be able to go on family vacations again.  I would like to be able to—I mean when I get on my feet more financially, to start a savings account for my children so that they can choose to go to college if they like or—I just know more now than I did before.
>
> And I just—I don't think that the rest of my life should be defined by the mistake that I made or the rest of my children's lives by not having their parents.

Father and Mother moved frequently during the time their DFPS case was open.  Moore testified that their frequent moves made their housing situation unstable.  They lived in a house rented from Grandmother and Grandfather from early 2010 to August 2010.  At that time, Mother moved to Nacogdoches, and Father moved shortly thereafter.  Father testified that he did not have a job when he moved to Nacogdoches.  He then got a job near Austin, and moved down in November.  Mother followed him in December.  They moved back to Denton in March 2011.

56

Father testified that he planned on marrying Mother but was waiting for a time when he would be "in a place in [his] life where [he could] give her a wedding." Moore testified that Mother seemed "very dependent on [Father], or any male in her life, and it would be concerning that she would proceed to get into another unhealthy relationship with another inappropriate person."

**Analysis**

Moore testified that neither parent requested an extension so they could complete their services. Grandmother testified that at the time of trial, she did not think that Mother and Father were ready to have the children returned to them. She did think that they had made significant improvements since the beginning of the case. Ex-Husband testified that he was "very concerned and disturbed" by the possibility of Abigail going back to Mother if her rights were not terminated. He was also concerned about Abigail's ongoing relationship with Father. He stated that he was concerned for Abigail's safety as long as Mother and Father were together. He believed it was in Abigail's best interest to terminate Mother's parental rights. He testified that it would "possibly" negatively affect Abigail if Mother's rights were terminated but that it would also possibly negatively affect her if Mother's rights were not terminated.

The parents' testified that they made attempts to complete their services in the different cities where they had lived. However, Department employees testified that the parents appeared to avoid their services. After the children were removed, the parents continued to behave in a manner that did not indicate that

they had good judgment or that they took the children's removal seriously. *See In re J.L.B.*, 349 S.W.3d 836, 849 (Tex. App.—Texarkana 2011, no pet.) (noting that the parents' "poor judgment [and] the constancy of their drug use" weighed in favor of terminating their parental rights).

While the evidence was uncontroverted that both parents had been drug free for about six months by the time of trial, neither parent was attending NA or AA meetings regularly, and they had been discharged as unsuccessfully completing First Steps. And although both parents were on methadone for opiate addiction, they both testified that they did not have the requisite addictions required to be treated at the methadone clinic. If they did not have the addiction they told the clinic they had, then they were dishonest with the clinic. If they did have a long opiate addiction, then they were dishonest at trial. The inconsistencies in their accounts concerning their drug use show a pattern of misrepresentation or dishonesty. Dr. Foster's reports for both parents warned of the likelihood that they would relapse. Further, "evidence of improved conduct, especially of short-duration, does not conclusively negate the probative value of a long history of drug use and irresponsible choices." *In re J.O.A.*, 283 S.W.3d 336, 346 (Tex. 2009).

Both parents had been incarcerated. *See In re J.B.W.*, 99 S.W.3d 218, 229 (Tex. App.—Fort Worth 2003, pet. denied) (holding that incarceration is one factor courts can consider when determining the best interest of a child in a termination case). Father had an extensive criminal history dating from 2005.

*See R.R.*, 294 S.W.3d at 235 (considering evidence of a father's past convictions supportive of the trial court's best interest finding); *In re S.M.L.*, 171 S.W.3d 472, 480 (Tex. App.—Houston [14th Dist.] 2005, no pet.) (stating that the father's incarceration and pattern of criminal and violent conduct made it likely that he would face incarceration again in the future). Even after they had stopped using drugs, the parents continued to engage in criminal activity. They both had pending charges at the time of trial.

Their service plan required both parents to maintain employment and suitable housing for their children. Neither parent contests the sufficiency of the evidence to support the trial court's finding that they failed to comply with the provisions of the court order that specifically established the actions necessary for the return of their children. The fact that neither parent had stable employment or housing, along with the evidence that made obtaining those necessities doubtful based on past conduct, could be compelling evidence that termination of the parents' rights would be in the best interest of the children.

Moore testified that DFPS believed it was in Abigail's best interest for Ex-Husband to have sole managing conservatorship of Abigail. She based this on the Department's observations of Ex-Husband caring for Abigail throughout the case. Moore said, "[Abigail] is happy. She's healthy. She's well-cared for. He's completely appropriate. There has never been any concerns with him not doing everything in his power to protect her and notifying the Department of anything that he needs." Moore believed Mother's rights to Abigail should be terminated

59

based on "[o]ngoing drug use, ongoing behaviors, lack of completion of services and inappropriate decision-making on her part." Mother testified that she suffered from depression, yet she denied being on medication. DFPS closed a previous case on Mother because she sought treatment for anxiety and bipolar disorder from MHMR. *See In re K.W.*, No. 02-08-00162-CV, 2009 WL 417913, at *6 (Tex. App.—Fort Worth Feb. 19, 2009, no pet.) (mem. op.) ("Despite Appellant's bipolar diagnosis, she did not take medication and had not sought treatment from a mental health expert. This evidence also tended to show a potential emotional and physical danger to the children."); *In re E.A.W.S.*, No. 02-06-00031-CV, 2006 WL 3525367, at *11–12 (Tex. App.—Fort Worth Dec. 7, 2006, pet. denied) (mem. op.) (holding that mother's "instances of mental instability and agitation, including threatening behavior and suicidal ideation" supported termination); *In re K.A.S.*, 131 S.W.3d 215, 226 (Tex. App.—Fort Worth 2004, pet. denied) (discussing the emotional and physical danger of the mother's noncompliance in taking medications for her bipolar disorder).

Moore also testified, "[Maria] is very young. She's not even two years old yet. She needs stability and, again, she needs permanency. And the parents have not adequately shown that they can provide a stable, safe, protective, drug-free environment for her." Further, Moore said, "[Maria] deserves to be adopted. She deserves to be raised by a stable, loving environment that will always keep her safe and be looking out for her best interest opposed to other people's best

interest." Moore was concerned that there would be future issues with the parents if their rights were not terminated.

Based on our review of the entire record, we hold that the jury could have reasonably formed a firm conviction or belief that termination of the parent-child relationship would be in the best interest of both children. *See* Tex. Fam. Code Ann. § 161.001; *C.H.*, 89 S.W.3d at 28. We overrule Father's first issue and Mother's first and second issues.

## Conclusion

Having overruled Grandmother's, Father's, and Mother's issues, we affirm the trial court's judgment.

LEE GABRIEL
JUSTICE

PANEL:  GARDNER, WALKER, and GABRIEL, JJ.

DELIVERED:  November 8, 2012